# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE POOVATHUR, MARK JACOBS, and FRANK PACIFIC, on behalf of themselves and all similarly situated persons, | |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | 1:14-cv-10083 |
| AVON PRODUCTS INC., GINA CALVARIO FITZSIMONS, RICHARD VALONE, SHALABH GUPTA, ROBERT LOUGHRAN, MICHAEL RUSSNOK, and JOHN DOE or JOHN DOES, serving as the VICE PRESIDENT OF HUMAN RESOURCES, NORTH AMERICA BETWEEN JULY 31, 2006 and JANUARY 1, 2015, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs George Poovathur, Mark Jacobs, and Frank Pacific (collectively, "plaintiffs"), individually and on behalf of the class of other similarly situated employees and former employees of Avon Products Inc. ("Avon" or the "Company"), who were participants in and beneficiaries of the Avon Personal Savings Account Plan as established in the January 1, 2002 Amended and Restated Personal Savings Account Plan (the "2002 Plan") and the January 1, 2010 Amended and Restated Personal Savings Account Plan (the "2010 Plan") (collectively, the "Plan"),  allege the following based upon the investigation of counsel, which included a review of governing Plan documents; Annual Reports filed on behalf of the Plan with the United States Securities and

Exchange Commission ("SEC"); discussions with Plan participants; SEC filings by Avon; the December 17, 2014 SEC Complaint against Avon (the "SEC Complaint"); other lawsuits against Avon; and press releases and other public statements issued by the Company. Plaintiffs believe that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against cosmetics giant Avon and several of its senior executives, all fiduciaries of the Company's retirement plan, by the participants in the Plan, whose retirement accounts suffered millions of dollars in losses due to the abject failure of those fiduciaries to take any action whatsoever to protect those employees to whom they owed "the highest duty known to the law." The Plan is sponsored by Avon for eligible employees and is a defined contribution plan. This class action is brought on behalf of participants in the Plan who invested in and/or held shares of the Avon Common Stock Fund (the "Stock Fund") between July 31, 2006 and January 1, 2015, inclusive (the "Class Period").

2.      For many years, Avon engaged in numerous violations of the U.S. Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-1 *et seq*. (the "FCPA"). Repeatedly, Avon committed the crime of bribing foreign officials, particularly in China (but also throughout Latin America). When Avon learned that its foreign subsidiaries had engaged in this misconduct, rather than come clean to the investing public—and to its employees—about the extent and severity of its wrongdoing, Avon embarked on a

lengthy cover-up, insistently telling the public and the government that it was fully compliant with all criminal statutes, including the FCPA. Even after U.S. civil and criminal authorities began looking into Avon's misconduct, Avon continued to tell the world that it was simply "investigating" these matters and that it had no idea whether any actual wrongdoing had actually occurred. Moreover, when whistleblowers emerged within Avon to contradict this fiction, Avon either paid them off with a hefty severance or simply fired them.

3.     Avon's years of misrepresentations to the public kept its stock trading at an artificially inflated price throughout the Class Period. During this time, bits of the truth began to emerge, such as in October 2008, when Avon reluctantly disclosed that it was internally investigating the possibility of misconduct in connection with its China operations, or in October 2011, when the SEC initiated its own investigation into Avon's FCPA violations. Consequently, throughout the Class Period, Avon's stock price steadily declined, with the full truth of Avon's unlawful conduct only emerging on May 1, 2014, when a joint settlement with the SEC and the Department of Justice ("DOJ") was announced.

4.     Even after Avon's stock price finally reflected its true value, however, the Company continued to perform poorly. Over the next eight months, after having already endured three straight years of near-constant decline, Avon's stock lost another one-third of its value. During this period it was obvious that, even with an accurately valued stock price, Avon stock was not a prudent investment to hold.

5.     The defendants in this case were fiduciaries of the Plan, and thus were charged with protecting the interests of Plan participants above all else. In particular,

ERISA required these fiduciaries to manage Plan participants' investments prudently, including their investments in the Stock Fund.

6.      What has come to light, however, from the SEC and DOJ investigations of Avon, as well as from Avon's own belated admissions of the truth, is that the Plan fiduciaries were well aware of Avon's FCPA violations, its program of firing or paying off potential whistleblowers, and its series of misrepresentations to the public about those violations.  They knew that these actions were causing Avon's stock price to trade at an artificially high price, and that when the truth finally came out, the effect would be devastating for anyone who happened to be holding that stock at the time.

7.      Then, after May 1, 2014, when Avon's stock price accurately reflected its value, that value sank precipitously (having already declined for more than three consecutive years despite being artificially inflated).   Yet defendants kept Plan participants invested in the Stock Fund during this period as well, resulting in even greater harm to those Avon employees.

8.      Given their awareness of Avon's misconduct and misrepresentation, the Plan fiduciaries could have taken at least one or both of two steps to protect Plan participants from harm:  (1) they could have implemented a freeze on purchases of shares of the Stock Fund either during the time that they knew the stock to be priced artificially high or after it was accurately priced but remained an imprudent investment; or (2) they could have complied with their obligation under ERISA to communicate truthfully and accurately with Plan participants—and all other Plan fiduciaries—and corrected the misinformation that had been disseminated through Avon's public filings and statements.

9.      Either of these actions was within the powers of the Plan fiduciaries.  As the Plan's governing documents make clear, the Plan fiduciaries always retained the right to direct the investment policies of the Plan, including the Stock Fund.  Even where the Plan gave these fiduciaries the right to delegate management of the Stock Fund to a third-party manager, the fiduciaries retained the power to issue new investment guidelines to that manager that the latter was required to follow.  Thus, had they shown any interest in complying with their fiduciary duties, the Plan fiduciaries could have issued new investment guidelines implementing a freeze on purchases in the Stock Fund during the Class Period.

10.     Likewise, the Plan fiduciaries could have disclosed to Plan participants the truth behind Avon's misrepresentations.  To ensure that such a disclosure would not run afoul of the securities laws prohibiting insider trading, the Plan fiduciaries could have worked to ensure that the Company disclosed this truth to the general public at the same time, thus allowing simultaneous compliance with Avon's obligations under ERISA and the securities laws.

11.     Indeed, it is clear that defendants understood that freezing purchases into the Stock Fund was an option, because Plan participants were finally told late in 2014 that "**effective January 1, 2015, the Avon Stock Fund will be frozen to new investments**" (emphasis in original).  *Somebody* with the power to freeze purchases saw that the stock was still on a downward slope with no sign of recovery apparent, and thus belatedly took action that would prevent even further damage to Plan participants.  Still, this move was too late to prevent the considerable losses suffered just in the prior eight months (let alone over the prior eight years).

5

12.     The Plan fiduciaries could not have reasonably believed that taking the above actions would do more harm than good to Plan participants.  While they might have believed that disclosing the truth would cause Avon's stock price to decline, it is always the case that disclosure will have that effect when a company commits fraud.  The longer the fraud goes on, however, the greater the damage to shareholders—including the Plan participants here.

13.     Similarly, once the truth had finally come out, and Avon's stock price soon resumed its more-than-three-year decline, Plan fiduciaries could not have reasonably believed that freezing purchases was a more harmful option than continuing to hold on to a facially imprudent investment.  Indeed, since the freeze was finally implemented as of January 1, 2015, Avon's stock has dropped *even further*; at least Plan participants were spared that harm.

14.     Defendants allowed those to whom they owed their fiduciary duties to be defrauded for nearly eight years, and then to continue to suffer at the hands of a plainly imprudent investment, without taking a single action to protect them in any way.  During that time, Avon's stock price went from approximately $32 a share to a little over $9 a share, losing almost *three-quarters* of its value and costing Avon employees hundreds of millions of dollars in retirement savings.  Defendants, as fiduciaries, are directly responsible for this enormous harm that their complete dereliction of duty caused.

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

16.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some defendants reside or maintain their primary place of business in this district.

17.     Specifically, this district is an appropriate venue for this action because the Plan's annual report filings on SEC 11-K list the address of the Plan in this district. Further, the principal executive offices of Avon are located in this district.   Additionally, it is likely that many of the parties and potential witnesses, including the Plan's Fiduciaries, are located in or are within close proximity of this district.

### III.     PARTIES

18.     Plaintiff George Poovathur is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   He is a former employee who purchased and held the Avon Common Stock Fund in a retirement savings account through the Plan during the Class Period.

19.     Plaintiff Mark Jacobs is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   He is a former employee who purchased and held the Avon Common Stock Fund in a retirement savings account through the Plan during the Class Period.

20.     Plaintiff Frank Pacific is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   He is a former employee who purchased and held the Avon Common Stock Fund in a retirement savings account through the Plan during the Class Period.

21.     Defendant Avon is a New York corporation with headquarters at 777 Third Avenue, New York, New York.   Avon's stock trades on the New York Stock Exchange Inc. under symbol "AVP."   At all times, Avon is and was the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).   Additionally, Avon is a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it had discretionary authority and control regarding the management of the Plan and/or the Plan's assets.   Specifically, pursuant to the 2002 Plan, and as set forth in Form 11-Ks filed with the SEC, Avon was the Plan Administrator from the beginning of the Class Period through December 31, 2009.

22.     Defendant Gina Calvario Fitzsimons served as Avon's Vice President of Global Compensation and Benefits from 2011 through 2014, at which time she became the Vice President of Human Resources, North America, a position she still holds. According to the 2010 Plan, by serving in these positions, Fitzsimons also served as a Plan Administrator and a member of the Benefits Board, and was thus a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

23.     Defendant Richard Valone served as Avon's Treasurer from 2006 through 2012.  According to the 2010 Plan, by serving in this position, Valone also served as a Plan Administrator and a member of the Benefits Board, and was thus a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

24.     Defendant Shalabh Gupta served as Avon's Treasurer from 2012 through January 1, 2015.  According to the 2010 Plan, by serving in this position, Gupta also served as a Plan Administrator and a member of the Benefits Board, and was thus a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

25.     Defendant Robert Loughran served as Avon's Assistant Controller from 2010 through May 2012.  According to the 2010 Plan, by serving in this position, Loughran also served as a Plan Administrator, and was thus a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.  Loughran is currently the Chief Financial Officer of Avon.

26.     Defendant Michael Russnok served as Avon's Assistant Controller from May 2012 through January 1, 2015.  According to the 2010 Plan, by serving in this position, Russnok also served as a Plan Administrator, and was thus a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

27.     Defendant John Doe or John Does served as Avon's Vice President of Human Resources, North America between 2010 and January 1, 2015.  (The identity of this individual or individuals is not known to Plaintiff at this time.)  According to the 2010 Plan, by serving in this position, John Doe or John Does also served as a Plan Administrator and a member of the Benefits Board, and were thus fiduciaries of the Plan

pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets.

## IV.   THE PLAN'S FIDUCIARIES AND MONITORING

28.   The Plan is a defined contribution benefit plan that is sponsored by Avon for eligible employees and is subject to ERISA.  Employees can defer up to 25% of their qualified compensation into the Plan, and Avon will make a matching or partially contribution of three-to-six percent.

29.   From the beginning of the Class Period through December 31, 2009, the 2002 Plan was in effect.  From January 1, 2010 through the end of the Class Period, the 2010 Plan was in effect.

### A.  The 2002 Plan

30.   At the start of the Class Period, the 2002 Plan was in effect.  The Plan held approximately total assets of approximately $609 million in various investments.  The Plan had $205 million that was invested in the Avon Company Stock Fund, which was the single largest investment.

31.   Under the 2002 Plan, and as averred in Avon's Form 11-Ks, Avon was the Plan Administrator.  Section 1.41 of the 2002 Plan provided that the Plan Administrator was a "Named Fiduciary" (Section 1.41) and had the authority to "specify from time to time to the Trustee or Investment Manager, as applicable, the identity of and the investment goals and objectives for each Individual Fund" (Section 1.37).

32.   The 2002 Plan also provided the Plan Administrator with the power and duties to: i) "direct or restrict participant elections to invest or transfer among Individual

Funds" (Section 5.1); ii) "[t]o review at least quarterly the performance of the Investment Manager and Trustee retaining investment discretion" (Section 12.3(c)); iii) "[t]o report on its activities and on the investment performance of the Investment Manager or Trustee at least annually to the Board" (Section 12.3(e)); iv) "to adopt such forms, rules and regulations as it shall deem necessary or appropriate for the administration of the Plan and the conduct of its affairs…" (Section 12.3(f)); and v) "to remedy any inequity resulting from incorrect information received or communicated or from administrative error" (Section 12.3(h)).

33.     In sum, through December 31, 2009, Avon was a Named Fiduciary of the Plan.  Although Avon was permitted to delegate to a third-party Investment Manager the day-to-day discretionary management of the Plan, including the Stock Fund, Avon retained the power to "specify … to the … Investment Manager … the identity of and the investment goals and objectives" of the Stock Fund.  Avon also had the power to "direct or restrict participant elections to invest or transfer among Individual Funds," including the Stock Fund.  Accordingly, during the portion of the Class Period when it was a Plan Fiduciary, Avon could have specified new "investment goals and objectives" to the Investment Manager of the Stock Fund to freeze purchases into that fund for so long as the stock price was artificially inflated due to Avon's fraudulent conduct.  Alternatively, Avon could have restricted "participant elections" into the Stock Fund during that time for the same reason.

34.     In addition, as a Plan fiduciary under ERISA and the entity responsible for administering the 2002 Plan, Avon was obligated to ensure that truthful and accurate information regarding the Plan and its investments were communicated to Plan

11

participants. Thus, once Avon had become aware that its stock price was trading at an artificially high price due to the fraudulent concealment of its FCPA violations, it could have disclosed the truth of its underlying conduct to Plan participants, thus allowing them to prevent further diminution of their investments and further harm to their retirements.

35.     Moreover, Avon could have made this disclosure simultaneously with a truthful and accurate disclosure regarding its conduct to the general public, thereby complying with its obligations under the securities laws at the same time it complied with its obligations under ERISA.

**B.   The 2010 Plan**

36.     From January 1, 2010, through the end of the Class Period, the 2010 Plan was in effect. The 2010 Plan changed the allocation of duties and the constituency of the Plan's administrators and managers.

37.     Section 1.42 of the 2010 Plan provides that the Plan Administrator, the Retirement Board (later renamed the Benefits Board), and the Investment Committee are among the "Named Fiduciaries" of the Plan.

38.     Per Section 12.2 of the 2010 Plan, the Plan Administrator and the Benefits Board are comprised of specified individual Avon employees. The Plan Administrator is comprised of the i) Vice President, Global Compensation and Benefits; ii) Director, Benefits; iii) Treasurer; and iv) Assistant Controller. The Benefits Board is comprised of the: i) Vice President, Global Compensation and Benefits; ii) Director, Benefits; iii) Vice President, Human Resources, North America; iv) Treasurer; and iv) Manager-Treasury, Global Finance. Between January 1, 2010 and May 1, 2014, Defendants Fitzsimons, Valone, Gupta, Loughran, Russnok, and John Doe or John Does (together, the

12

"Individual Defendants") held at least one of the above positions. Thus, during the period of time when each of the Individual Defendants held one of the above positions, that Individual Defendant was a Named Fiduciary of the Plan.

39.     The 2010 Plan provided that the Plan Administrator had the authority to "specify from time to time to the Trustee or Investment Manager, as applicable, the identity of and the investment goals and objectives for each Individual Fund" (Section 1.38), including the Stock Fund (Sections 1.29, 1.38, 5.1, 5.3). The Plan Administrator also had the authority to establish rules relating to the investment of contributions and transfer of the participants' accounts between one or more of the Individual Funds (Section 5.1); and to establish rules for the administration of the Plan and the transaction of its business (Section 12.2(d)). The only restriction placed on the Plan Administrator's power with respect to the Stock Fund was that it could not eliminate the Stock Fund, or the investment accounts comprising the Stock Fund, altogether (Section 12.9(a)).

40.     The 2010 Plan provided that the Benefits Board had, among other powers, the authority, like the Plan Administrator, to establish rules relating to each participant's election to transfer up to 100% of the balance of the participant's account among various Individual Funds (Section 5.3). The Benefits Board was also empowered to appoint and monitor the Investment Committee (Section 12.3(b)(2)), which, in turn, was authorized "[t]o appoint and monitor one or more Investment Managers and to specify the investment guidelines or other limitations applicable to such Investment Manager, consistent with the funding policy of the Plan and any guidelines or limitations specified by the [Benefits] Board" (Section 12.3(c)(1)).

41.     Thus, the Benefits Board could specify investment guidelines to the Investment Committee, which would then impose those guidelines on a third-party Investment Manager, which would be obligated to comply with those guidelines.  Even if the Benefits Board, through the Investment Committee, decided to delegate discretionary investment management authority of the Stock Fund to a third party, the Benefits Board retained the right to impose binding investment guidelines on that third party.

42.     As with the Plan Administrator, the only restriction placed on the Benefits Board with respect to the Stock Fund was that it could not eliminate it altogether as an investment option.

43.     It is clear from the 2010 Plan, however, that the Plan Administrator and the Benefits Board were empowered to take necessary action to protect the interests of Plan participants, including those invested in the Stock Fund.  Thus, when the Individual Defendants serving as Plan Administrator, Benefits Board member, or both, became aware of Avon's FCPA-related misconduct, its fraudulent misrepresentation of that misconduct to the public, and the artificial inflation of Avon's stock price as a result of this misrepresentation, they had the ability to take the same actions to protect Plan participants that Avon, the prior Plan Administrator under the 2002 Plan, could have taken.

44.     The Plan Administrator could have specified a new investment policy for the Stock Fund—one of the 2010 Plan's "Individual Funds"—to freeze purchases of shares of the Stock Fund during the time when Avon's stock price was valued at an artificially high price, or after it was priced accurately but remained imprudent due to its consistently negative performance.

45.     Alternatively, or simultaneously, either of the Plan Administrator, the Benefits Board, or both, could have truthfully and accurately disclosed to Plan participants the truth underlying Avon's misrepresentations.   Considering that the Individual Defendants were senior officers of Avon, they could have taken action to effectuate truthful and accurate disclosure of this same information to the general public at the same time, thereby ensuring that compliance with ERISA and the federal securities laws remained coextensive.

46.     During the Class Period, the Individual Defendants knew that the Plan was heavily concentrated in Avon stock, and that it suffered substantial losses.   At the start of the Class Period, the Stock Fund held approximately $205 million of Avon stock.   At that time, Avon's stock price was approximately $32 per share.   By the time Avon's long fraud finally concluded in May 2014, Avon's stock price was approximately $13 a share. By the end of the Class Period, it was roughly $9 a share.   The breadth and depth of that damage to Plan participants, which the Individual Defendants did absolutely nothing to try to prevent, speaks for itself. Had defendants acted prudently by suspending transactions in Avon stock, or by providing truthful disclosure, plaintiffs and other Plan participants would have avoided the substantial damages that they suffered.

## V.     FACTS BEARING ON THE FIDUCIARY BREACHES

### A.  Avon's Bribery "Opened" the China Market

47.     Avon is a leading global beauty company, with over $10 billion in annual revenues.   As the world's largest direct seller, Avon markets to women in more than 100 countries through approximately 6.5 million active independent Avon Sales

Representatives. Avon's growth has been fueled by overseas sales, particularly in emerging markets.

48.     In 1977, Congress enacted the FCPA in 1977 to halt the bribery of foreign officials and to restore public confidence in the integrity of the American business system.   Under the FCPA, it is unlawful for companies such as Avon to make payments to foreign officials to obtain or retain business.   The FCPA also requires that companies establish and maintain adequate internal controls to detect and prevent such bribes and kickbacks from occurring.   In addition, the FCPA requires public companies to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company.   Non-compliance with the FCPA may result in substantial fines, sanctions, and other adverse actions, including exposing the company to civil liability.

49.     During the second half of 2004 and early 2005, Avon was at an economic crossroads, needing to generate revenue internationally to help the Company replace rapidly declining sales in the United States.    To overcome declining domestic sales, Avon focused on increasing revenue in so-called developing markets around the globe, including China and several nations in Latin America.   China, in particular, represented a tremendous growth opportunity for Avon.

50.     Yet Avon faced a significant obstacle.   In 2004, Avon was unable to rely on its primary business model in China because that country had imposed a ban on direct sales in 1998.   Avon's sales in China were tied to its retail outlets known as "Beauty Boutiques," the growth potential of which was severely limited.   Therefore, for Avon to

expand its operations in the growing Chinese market, Avon needed first to convince Chinese government officials to permit direct selling.

51.     In September 2005, the *South China Morning Post* reported that the central Chinese government had published a new direct sales law.  According to that report, the new law involved two sets of regulations. The first, lifting the ban on direct sales, was to take effect on December 1, 2005.  The second, codifying an existing ban on pyramid sales with fines and criminal prosecution, was to take effect on November 1, 2005.

52.     On February 22, 2006, China's Ministry of Commerce ("MOC") announced via its website that it had approved Avon's application for direct selling, allowing the Company to hire independent promoters to sell products directly to consumers.  The MOC also granted certificates to seven of Avon's employees, allowing them to train door-to-door vendors for the Company.  By virtue of this action, Avon became the first company to resume direct sales in China.

53.     China's abrupt "about face" with regard to direct selling and allowing Avon to have the first "test" licenses were a profoundly significant development for Avon.   Even more important, in or about March 2006, Avon reported that the MOC granted Avon a permanent direct selling license.

54.     According to the SEC, Avon was able to persuade the Chinese government to change its policy on direct selling, and obtain direct selling licenses, only through undisclosed bribes that were made in violation of the FCPA.  Avon  provided cash and things of value, including gifts, travel, and entertainment, to various Chinese government officials, including government officials responsible for awarding a test

17

license, and subsequently a direct sales business license, that would allow a company to utilize direct door-to-door selling in China.

55.     The SEC also found that Avon also adopted an internal "no penalty policy" and provided cash and things of value to Chinese government officials to avoid fines and other penalties in order to maintain an ostensibly pristine corporate image. Avon Products China also paid a third-party consultant for purportedly legitimate interactions with government officials, even though Avon's management knew the consultant's invoices were often false and could not point to legitimate services provided by the consultant.  At times, payments were made to suppress negative news in state-owned media and to obtain competitor information.  In addition, Avon provided cash to government officials on behalf of various subsidiaries in China.

56.     The SEC further found that Avon failed to have sufficient internal controls to prevent FCPA violations, and that it deliberately failed to keep sufficient book and records documenting these payments.

## B.  Avon's Knowledge of FCPA Violations

57.     In 2005, Avon implemented changes to its management framework that had a significant impact on oversight responsibilities for its China operations.   According to Avon's December 7, 2005 Form 8-K filed with the SEC, the restructuring was designed to "bring senior management closer to its key business geographies" and to "give management a clearer line of sight to day-to-day business operations and get closer to its Representatives and customers."

58.     As a result, Avon's management knew about or recklessly disregarded the pervasive bribery activities at Avon in China as early as 2005, but in no event later than

June 2006.  At or about this time, Avon's senior management came to understand that the Company's internal audit function overseeing Avon's business in China detected that employees at Avon in China had made improper payments to Chinese government officials in violation of the FCPA.   Notably, a draft audit report reflecting such unlawful activities was generated at Avon no later than June 2006, and possibly as early as 2005.

59.    At this time, Avon was the Plan Administrator and a Named Fiduciary to Plan participants.  The knowledge of Avon's FCPA violations in China can be imputed to the Company itself.   Yet rather than take the steps necessary to ensure that FCPA violations ceased, Avon only sought to conceal its unlawful activities.

60.    Avon's Global Internal Audit Director, Fabian LaPresa, received via email a draft copy of an internal audit report of Avon that had uncovered inappropriate payments made to Chinese officials.    The payments were characterized as "bribery payments," with the report further stating that the unlawful charges were made to Avon's travel and entertainment account as a means of concealing their true nature.    The payments had initially escaped scrutiny because they were made by "senior management," and were eventually uncovered in an audit led by Mark Rajkovic, an Avon Audit Director who was responsible for the group that conducted that audit.

61.    In or about June 2006, LaPresa apparently exploited his knowledge of Rajkovic's audit report in discussions with his immediate superior over the severance package LaPresa was to receive after being terminated for misusing his expense account. LaPresa threatened to disclose the draft audit report that identified inappropriate payments made to Chinese officials to the SEC if Avon did not provide him with benefits beyond those to which he was entitled under Avon's strict severance policies.

62.     Under Avon policy, LaPresa was eligible for severance of only three months salary and benefits upon termination for cause.   Avon's Human Resources Department had a strict U.S. severance policy that Director-level employees (like LaPresa) who were terminated for cause were entitled only to three months of salary and health care benefits, and it was understood at the Company that Human Resources never made exceptions to increase an employee's severance package.

63.     However, Avon's Human Resources Department made an exception for LaPresa.   To procure his silence, and prevent him from becoming a whistleblower regarding Avon's unlawful activities, Avon provided LaPresa with a far larger termination package than normal.   The severance package included one year of severance and health benefits.   LaPresa was terminated for cause in June 2006.

64.     Knowledge of the circumstances of LaPresa's departure and payoff can be imputed to the Company, which was still Plan Administrator and a Named Fiduciary during this time.   Indeed, by July 31, 2006, Avon certainly was aware of the Company's FCPA violations in China, the sum and substance of Rajkovic's audit report, as well as the unusual circumstances surrounding LaPresa's termination.   Avon was also aware that none of these facts had been disclosed to the public, and that Avon's stock price was, therefore, trading at an artificially high price due to the concealment of this information.

65.     Yet Avon took no steps to make truthful disclosure of this information to Plan participants or to the public.   Nor did Avon use its powers as Plan Administrator to prevent purchases of shares in the Stock Fund by Plan participants until such time as the stock was no longer trading at an artificially high price.   In fact, despite its capacity as

Plan Administrator and a Named Fiduciary, Avon did nothing at all to protect the interests of those Plan participants invested in the Stock Fund.

### C. <u>Avon's Internal FCPA Investigation and Cover-up</u>

66.    Despite possessing evidence of its FCPA violations in China, Avon concealed this information entirely for another two years.  It was not until October 20, 2008, that Avon belatedly disclosed that it was investigating the legitimacy of certain travel, entertainment, and other expenses incurred in China, based on allegations made by a purported "whistleblower."    Even then, Avon revealed only that FCPA violations "may" have occurred when, in fact, they knew, from information in the internal audit report received by LaPresa in 2006 and other Avon employees, that such violations (later found to be extensive by the SEC) already had occurred.  Avon also knew that its internal controls, procedures and systems for FCPA compliance had failed.

67.    On that October 20, 2008 disclosure, Avon's stock price declined significantly.  Because Avon was still concealing its actual knowledge of its misconduct in China, however, falsely characterizing this misconduct as something that "may" have occurred when Avon knew for a fact that it had occurred, Avon's stock price, though dropping, was still artificially inflated.

68.    Had Avon disclosed to the public, including Plan participants, the full truth at this time, it would have been complying with its duties under ERISA and the securities laws.  Avon also could have used its powers as Plan Administrator under the still-governing 2002 Plan to prevent Plan participants from buying into the Stock Fund while the stock was artificially inflated in value.  But, as it done for the prior two years,

Avon chose to do nothing to help Plan participants—or to correct the improper valuation of its stock price—at this time.

69.     Avon's bribery activities were not limited in scope or time.  According to a May 4, 2011 *Wall Street Journal* article, the illegal payments had occurred as early as 2004, and continued until as late as 2010—one year after Avon purportedly expanded its investigation of FCPA violations to include several countries other than China. Unfortunately, even this significant effort of investigative journalism by the *Journal* did not come close to uncovering the full extent of Avon's wrongdoing and subsequent cover-up; it would take another three years for the whole truth to be known.

70.     What Avon has done, however, to ensure that the public did not learn of its misconduct, was to fire several employees.  For example, in April 2010, Avon announced that, as part of its FCPA investigation, four senior executives, including the General Manager of Avon in China, would be put on administrative leave.  Likewise, in February 2011, Avon announced that Bennett R. Gallina, the executive overseeing Avon in China (who reported directly to the CEO), had been placed on administrative leave, prompting his retirement just days later.

71.     Then, in May 2011, Avon terminated the services of the four senior employees whom it previously had placed on administrative leave.  Later that same month, the *Journal* reported that Avon's internal investigation had uncovered evidence of improper payments to government officials in several countries outside of China, including Brazil, Mexico, Argentina, India, and Japan.  However, Avon did not confirm these allegations or disclose this evidence.

22

72.     On May 23, 2011, Avon disclosed that Charles Cramb would no longer serve as Chief Finance and Strategy Officer when his replacement, Kimberly A. Ross, joined Avon in the fall of 2011.  Then, on December 14, 2011, Avon announced that its CEO Andrea Jung would step down as CEO as soon as a new executive is named to the post.  And, on January 31, 2012, the *Journal* reported that Avon terminated Cramb after evidence was uncovered that he knew of wrongful payments to foreign officials in China "as early as the middle of the last decade."

73.     Furthermore, on December 28, 2011, a lawsuit was filed by Debra Sabatini Hennelly, Avon's former Executive Director of Global Ethics and Compliance against Avon.[1]  In her complaint, Hennelly alleged that she was fired for insisting that Avon implement a legitimate compliance program in its Latin American operations in 2010—a request that Avon's General Counsel, Kim Rucker, rejected outright.

74.     By the time of these firings, the 2010 Plan was in effect, and Individual Defendants Fitzsimons and John Doe or John Does held senior positions in Avon's Human Resources Department and served as Plan Administrators and members of the Benefits Board.  It is certainly reasonable to infer that these Individual Defendants would have been aware at the time of these firings and why they were taking place.

75.     Indeed, even though John Doe or John Does were responsible for Human Resources in North America at this time, these firings related at least in part to FCPA issues arising in Latin America, which would have been within the jurisdiction of Human Resources North America.   In particular, the Hennelly firing and subsequent whistleblower civil suit, focused largely on improprieties in Latin America, would have

---

[1] *See Hennelly v. Avon Prods., Inc. et al.*, No MRS-L-3490-11 (N.J. Super. Ct. Law Div.) (the "Hennelly Complaint").

come across the desk of the Vice President of Human Resources for North America.  It is also reasonable to infer that a senior Human Resources official tasked with overseeing a large region such as North America would be made aware of firings of officials senior enough to have direct reporting lines to the CEO and other top executives.

76.   Individual Defendant Fitzsimons, responsible for Global Compensation and Benefits at this time, would certainly have been made aware of the circumstances surrounding these firings, if for no other reason than the termination of a senior officer will necessarily implicate issues involving compensation and benefits.  Anyone who has resigned or been fired from a company knows that issues of severance, extension of benefits, and the like arise as part of the departure process.  It defies reason to believe that Fitzsimons, the "Global" head of compensation and benefits, would not have been intimately involved in these proceedings and thus would have become aware of the misconduct to which they related.

77.   Nevertheless, neither Fitzsimons nor John Doe or John Does took any action at this time to protect Plan participants.  Once they became aware of the reasons for these firings, and the unlawful activities in China and elsewhere from which they arose, they would have—or should have—recognized that the extent of those activities had not been revealed to the public.  As Plan fiduciaries who owed "the highest duty known to the law," they could have—or should have—undertaken even a minimal effort to determine whether the concealment of those unlawful activities might be harmful to Plan participants, including by artificially inflating the stock price and thereby subjecting investors in the Stock Fund to serious losses once the truth was inevitably revealed.

24

78.     Yet neither fiduciary took any of these steps, and Plan participants were severely damaged as a result of this inaction.

**F.   <u>The SEC and DOJ Settlements and Findings</u>**

79.     In its Form 10-K dated February 25, 2010, Avon stated that it had entered into tolling agreements with the DOJ and SEC, and could face fines, criminal penalties, and/or sanctions related to the Company's bribery of Chinese government officials.

80.     Then, on October 27, 2011, on its Form 10-Q, Avon disclosed that the SEC had commenced a "formal" investigation concerning the Company's FCPA violations.   Nonetheless, Avon still had not made public the results of its internal investigation, nor had it disclosed its payoff of LaPresa or the whole story surrounding its rash of executive firings over the past year.   Thus, Avon's stock price continued to trade at an artificially high price.

81.     Avon's disclosure of the SEC investigation caused Avon's common stock price to decline materially on October 27, 2011.   On October 27, 2011, Avon common stock closed at $18.81 per share, a decline of $4.20 per share, or 18.25%, from the prior day's closing price.

82.     In August 2013, Avon disclosed that it had begun settlement talks with the government and that it made a settlement offer for the payment of monetary penalties of approximately $12 million.   This misleading disclosure served to minimize the extent of Avon's liabilities for FCPA violations and thus still did not paint a fully truthful and accurate picture of the extent of Avon's wrongdoing.   Not surprisingly, Avon's stock price continued to decline during this time.

83.    Finally, on May 1, 2014, Avon announced the terms of its settlement with the SEC and DOJ, which included payments of **$135 million** for alleged violations of the books and records and internal control provisions of the FCPA, a deferred prosecution agreement, and the imposition of a compliance monitor for 18 months.  After years of half-truths and critical omissions of truth, Avon finally admitted the extent of criminal and civil wrongdoing with regard to China.  As a consequence of this final revelation, Avon's stock dropped once again, going from the previous day's closing price of $15.28 to a closing price of $13.72—a one-day loss of roughly ten percent of its value.

84.    It is reasonable to infer that the other Individual Defendants during the Class Period—the Treasurers, Valone then Gupta, and the Assistant Controllers, Loughran then Russnok—were, like their Human Resources colleagues among the Plan fiduciaries, aware of Avon's misconduct between 2010 and 2014 and could have—or should have—concluded that the concealment of such misconduct was artificially inflating Avon's stock price and thereby harming Plan participants invested in the Stock Fund.

85.    Indeed, the FCPA violations that Avon concealed bore directly on Avon's accounting of its Chinese (and Latin American) operations.  It can be reasonably inferred that Loughran (until May 2012) and Russnok (from May 2012 forward) as deputy to Avon's Controller—its Chief Accounting Officer—would have had some role in, or at least knowledge of, the reconciliation of the various "expenses" and "gifts" related to those operations.

86.    Moreover, the slow but steady revelation of information regarding Avon's misconduct and the government investigations it had caused had a powerful negative

effect on Avon's stock price during the Class Period. It is reasonable to infer that Valone then Gupta, as Treasurer and thus a high-ranking finance officer, would have paid close attention to that negative activity and thus would have become aware of the circumstances giving rise to the aforementioned misconduct and investigations.

87.     What is not reasonable is to believe that, armed with this knowledge of Avon's wrongdoing and its failure to fully disclose that wrongdoing, any of the Individual Defendants—Loughran, Russnok, Valone, Gupta, Fitzsimons, John Doe or John Does—could have believed that taking action to protect Plan participants from harm could possibly have done more harm than good, that continuing to cover up a fraud could ever be better than telling the truth.

88.     Those Individual Defendants who were Plan Administrators could have implemented a new governing investment policy for the Stock Fund that would have halted purchases while the stock was artificially high. Those Individual Defendants who were members of the Benefits Board could have imposed new investment guidelines restricting purchases of shares of the Stock Fund was the stock was artificially high. Any or all of the Individual Defendants could have worked to ensure truthful and accurate disclosure of Avon's misconduct to the general public and to Plan participants at the same time. Instead, however, they chose to do nothing.

## G.  Avon's  False and Misleading FCPA Disclosures

89.     The FCPA generally prohibits the corrupt offer, promise, or payment of anything of value to foreign government officials, political parties, party officials, or candidates to obtain or retain business or otherwise secure an advantage. Under the FCPA's deceptive record provisions, public companies are required to maintain accurate

books and records and an adequate system of internal accounting controls.   As an issuer subject to the federal securities laws, Avon has been at all relevant times required to comply with both the anti-bribery and the deceptive records provisions of the FCPA.[2]

90.    Through Avon's 2008 version of its Code of Business Conduct and Ethics, incorporated into its annual Form 10-Ks,  the Company informed the investing public that it sought to impose "a standard of ethical conduct beyond that required by mere technical compliance with the law or the minimum standards for business behavior." (Emphasis added.)   Its previous 2004 Ethics Code similarly stated that "[e]ach Avon associate is responsible for complying with all laws and regulations . . . and for avoiding even the appearance of improper conduct."   These documents also expressly prohibit "bribes" of any kind.

91.    Throughout the Class Period, Avon made numerous statements on its Form 10-Qs and Form 8-Ks regarding the Company's business and results from operations that were materially incomplete and/or false and misleading.  Avon failed to disclose that its "growth" and "success" in certain markets were due, in large part, to an illegal bribery scheme and could not have occurred but for that scheme.  Nor did the Company disclose that it had knowledge that extensive FCPA violations had already occurred, or that, once the full extent of Avon's illegal practices was revealed publicly, there would be criminal and regulatory investigations, civil and criminal settlements and fines, significant damage to reputation and other losses and costs.

92.    Additionally, throughout the Class Period Avon claimed that it strictly adhered to the highest ethical standards, was committed to a policy of complying with all

---

[2] *See* 15 U.S.C. § 78*l*.

applicable laws and regulations, and specifically that "[b]ribes, kickbacks and payoffs to government officials, suppliers and others [were] *strictly prohibited*."  However, such statements were materially incomplete and/or false and misleading given Avon's failure to disclose (a) the full magnitude and consequences of the Company's FCPA violations; (b) that the Company's compliance function and internal controls were woefully inadequate and, in many respects, virtually nonexistent; and (c) that violations of Avon's internal controls and corporate policy were ignored.

93.     Upon occasion, during the Class Period, Avon did issue some generic statements about the possible consequences of its internal investigation, as well as the SEC and DOJ investigations.  These statements included comments about the termination of its four senior managers in May 2011.   However, these statements were false and misleading because they failed to disclose known present facts about existing FCPA violations and the investigations, and they downplayed any impact these facts might have on Avon's business.   Avon's statements were further incomplete and, as such, misleading because they gave the false impression that any FCPA violations were minor and in the past, and that the Company was attempting to be fully compliant and dedicated to all remedial action when this was not true.

94.     As more scrutiny was placed on Avon's FCPA violations, its earnings from China declined.   During 2012 and 2013, Avon reported revenue impairments due to revenue declines from its business in China.  Avon also lowered its projections of future revenues from its business in China.  This downturn is strong evidence that Avon's previous revenues were inflated though its illegal business practices, and that more fulsome compliance has led to decreased revenues and income.

95. The relationship between Avon's FCPA investigation and declines in its financial performance had a negative impact on Avon's stock price, which declined substantially and experienced an almost uniformly downward trend over the Class Period.

96. The falsity of these representations was known to Defendant Avon between July 31, 2006 and December 31, 2009. It is also reasonable to infer that, based on their positions and seniority, that the Individual Defendants were aware of the falsity of these representations from January 1, 2010 through May 1, 2014.

**H.  Avon's Abysmal Post-Disclosure Performance**

97. After May 1, 2014, Avon's stock price was an accurate reflection of its inherent value. Nevertheless, the bad news for Avon continued apace.

98. On June 23, 2014, Avon announced that it was cutting an additional 600 jobs. During the prior two years, Avon had already slashed thousands of jobs and exited several unprofitable markets.

99. In late July 2014, Avon announced that in the second quarter of 2014, adjusted earnings per share had declined 31%, and revenues had declined 13%. In North America alone, sales were down 20% from the prior year. By this time, Avon's stock, having crept up slightly after it announced the SEC-DOJ settlement, was falling again, down to $13.07 by the close of the market on July 31, 2014.

100. In August 2014, Avon debt securities were placed on review for downgrade by ratings agency Moody's Investor Service.

101. On September 8, 2014, the resignation of Chief Financial Officer Kimberly Ross, effective October 2, 2014, was announced. On the heels of this announcement, the stock hit a 52-week low on September 30 of $12.45.

102.    Avon announced its third-quarter results on October 30, 2014, which included further earnings-per-share and revenue declines.  The stock dropped another 6.8% to $10.22, even though Avon's lackluster performance had actually beaten the estimates of analysts, who were so bearish about Avon by then that they had managed to overestimate how poor its performance would be.  After the announcement, analysts Stifel Nicolaus and B. Riley both downgraded Avon.

103.    On November 3, 2014, Standard & Poor's Ratings Services cut Avon's corporate credit rating to "junk."

104.    In November 2014, Avon announced that its troubled Latin American operations would be split between two executives going forward.  It also announced the departure of its Chief Marketing Officer Patricia Perez-Ayala.  The stock closed at $9.43 on November 19, 2014.

105.    On December 17, 2014, the SEC filed formal charges against Avon, *Securities and Exchange Commission v. Avon Products, Inc.*, Civil Action No. 14-cv-9956 (KPF) (S.D.N.Y.), detailing its alleged violations.   The SEC Complaint charged Avon with violations of the books and records and internal control provisions of the FCPA relating to Avon's bribery in China from 2005 to 2006, providing additional color regarding Avon's pattern of deception and misconduct.  By close of day on December 17, Avon's stock was trading at $9.33, a low from which it barely recovered by year's end.

106.    To date, Avon has incurred approximately $400 million in expenses and costs associated with its FCPA violations, in addition to the SEC settlement.  The settlement is likely to have a negative impact on Avon's future financial performance and its ability to generate revenues and profits.

31

## VI.     CLASS ACTION ALLEGATIONS

107.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All individuals, excluding defendants, who participated in the Plan and whose individual accounts purchased and/or held the Stock Fund at any time between July 31, 2006 and January 1, 2015, inclusive.

108.    Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

109.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are over 25,000 members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Avon or the Plan and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

110.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

111.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether defendants each owed a fiduciary duty to the Plan, to plaintiffs and to members of the Class;

b. Whether defendants breached fiduciary duties owed to the Plan, plaintiffs and members of the Class by failing to act prudently and loyally and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c. Whether defendants failed to provide sufficient material disclosure required under ERISA to the Plan participants;

d. Whether defendants failed to provide sufficient material disclosure to any and all Plan fiduciaries;

e. Whether defendants violated ERISA; and

f. The extent to which Class members have sustained damages and the proper measure of those damages.

112.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs and the other members of the Class each sustained damages and/or were negatively affected by defendants' wrongful conduct in violation of ERISA as complained of herein.

113.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

114.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is brought on behalf of the Plan and any prosecution of

separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

115.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

**COUNT I**
**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Against All Defendants)**

116.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

117.    At all relevant times, as alleged above, all defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

118.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with

the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

119.    A fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 11 04(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

120.    Defendants' duties of loyalty and prudence also obligate them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

121.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, defendants knew that the Stock Fund had become an imprudent investment for Plan participants' retirement savings because there was false and misleading material information given to Plan participants and the public about Avon stock which artificially inflated its value.

122.     Accordingly, defendants should have taken appropriate responsive action by restricting transactions or new investments by the Plan in the Stock Fund.  Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Avon's illegal foreign business practices, the extent of its FCPA violations, its lack of sufficient compliance structure and systems, the costs of its internal and external investigations, its true financial condition, and/or Avon's concealment of these problems.  As such, between July 31, 2006 and May 1, 2014, Plan participants could not appreciate the true risks presented by investments in Avon's stock and, therefore, could not make informed decisions regarding their investments.

123.     Even after Avon's fraud had concluded and its stock price accurately reflected its value, Avon's stock continued to decline steadily as the Company announced declining revenues and earnings while ratings agencies downgraded its credit, analysts downgraded its status, senior executives resigned, and hundreds of jobs were cut. Between May 1, 2014 and January 1, 2015, and in light of the three years of stock-price decline that preceded it, defendants should have recognized that the Stock Fund was not a prudent investment, and could have implemented a freeze on new purchases in the Stock Fund to protect Plan participants from harm.  That they finally did so as of January 1, 2015 does not excuse their prior failure to act while the stock price steadily fell and Plan participants continued to be harmed.

124.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiffs and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to

ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

**COUNT II**
**Failure to Adequately Monitor the Plan Fiduciaries and**
**Provide the Plan Fiduciaries with Accurate Information**
**(Against All Defendants)**

125.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

126.    At all relevant times, as alleged above, defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

127.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of defendants included the responsibility to appoint, evaluate, and monitor other Plan fiduciaries, including the Investment Committee, the Investment Manager and the Trustee, to whom certain fiduciary responsibilities were delegated.

128.    The duty to monitor entails ensuring that these other Plan fiduciaries each had truthful and accurate information to fulfill their respective jobs and duties as fiduciaries and to properly monitor, evaluate and oversee the Plan's investment in the Stock Fund.

129.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

130.    Defendants breached their fiduciary monitoring duties between July 31, 2006 and May 1, 2014 by failing to provide other Plan Fiduciaries with truthful and accurate information concerning Avon's illegal foreign business practices, the extent of its FCPA violations, its lack of sufficient compliance structure and systems, the costs of its internal and external investigations, its true financial condition, Avon's concealment of these problems, and the true risks of investing in Avon stock.

131.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiffs and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.

132.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for:

A.    Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing plaintiffs as class representatives, and determining that plaintiffs' counsel satisfies the prerequisites of Rule 23(g);

B.    Declaration that defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.    Declaration that defendants are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.     An Order compelling defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if defendants had fulfilled their fiduciary obligations;

E.     Imposition a Constructive Trust on any amounts by which defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.     An Order enjoining defendants from any further violations of their ERISA fiduciary obligations;

G.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

H.     An Order that defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in the Stock Fund in proportion to the accounts' losses attributable to the decline in the price of Avon's common stock;

I.     Awarding the Plan and/or Plan participants rescission and/or money damages including pre-judgment interest;

J.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

K.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      An Order for equitable restitution and other appropriate equitable monetary relief against defendants.

M.      Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

By: /s/  Samuel E. Bonderoff
        Samuel E. Bonderoff (SB 1591)

Jacob H. Zamansky (JZ 1999)
Edward   H.   Glenn,   Jr.   (EG   0042)


**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
samuel@zamansky.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, hereby certify in accordance with this Court's Individual Practices that on January 28,

2015, plaintiffs' counsel served the following document:

### FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

And supporting papers, by electronically transmitting via email the above listed

document to the email address set forth below:

| |
|---|
| Evan R. Chesler |
| Karin A. DeMasi |
| Cravath, Swaine & Moore, LLp |
| Worldwide Plaza |
| 825 Eighth Avenue |
| New York, New York  10019-7475 |
| echesler@cravath.com |
| kdemasi@cravath.com |

I certify under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

DATED:  January 28, 2015

By: /s/ *Samuel E. Bonderoff*

Samuel E. Bonderoff (SB-1591)
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, New York 10004
Telephone: (212) 743-1414
Facsimile:  (212) 742-1177
E-mail:  samuel@zamansky.com